## JOHNSTON v. GROSVENOR.

## (*Jackson.* June 5, 1900.)

1. BUILDING AND LOAN ASSOCIATIONS. *Method of adjusting accounts with borrowing stockholder.*

A borrowing stockholder, in the adjustment of his accounts with a building and loan association, is not entitled to credit, on his debt for dues paid on his stock while the association remained a going concern. He gets the benefit of these payments alone in the value of his stock. But he is entitled to credit on his debt for dues paid on his stock, without knowledge of the condition of the association, after it had become insolvent or had abandoned its organization. (*Post, pp. 358–362.*)

Case cited: Hargo v. Rogers, 92 Tenn., 35.

2. SAME. *Mortgage not barred by ten years statute of limitations, when.*

A mortgage taken by a building and loan association from its borrowing stockholder is not barred by the mere lapse of ten years from the date of maturity of the secured debt, where it is not contemplated that the debt shall be paid otherwise than by the borrower's payment of dues on his stock, thereby maturing it. To set the statute of limitations in motion against such mortgage, there must occur a breach of the contract by dissolution or insolvency of the association, or by default of the borrower in payment of dues, interest, or other legal charges, and, in such case, the statute begins to run only from date of such breach. (*Post, pp. 362, 363.*)

Cases cited: McElwee v. McElwee, 97 Tenn., 649; Runnells v. Jacobs, 100 Tenn., 397.

3. SAME. *Insolvency and its results.*

The insolvency of a building and loan association, meaning thereby that condition of its affairs in which it is unable to pay back to its members the amounts paid in by them respectively, dollar for dollar, puts an end at once to its operations, and, as it thus prevents the stock from maturing and extinguishing the loans, according to the contracts between the association and its borrowing members, constitutes a breach of those contracts, and, on the one hand, excuses the borrow-

21 P—23

ers from all further liability for the payment of dues and fines,. and on the other renders the mortgages given to secure the loans due and enforceable at once, without regard to their terms and even though payable in installments. (*Post, pp. 363–367.*)

4. SAME. *Condition of, that releases members from liability for dues.*

The condition of a building and loan association is such as to constitute a breach of its contract with borrowing members, and to forfeit its right to collect dues from such members, where its assets are confessedly insufficient to meet its liabilities to its members, and where it has, for two years, ceased to make new loans, or to do business other than in the direction of winding up its affairs, and all of whose officers and directors had resigned or signified their purpose to do so. (*Post, pp. 367–370.*)

5. SAME. *Borrower entitled to credit for value of his stock without. deduction of attorney fees and expenses for its collection.*

The Court holds that the borrowing member is entitled, under the facts of this record, to credit upon his mortgage debt for the full value of his stock, without paying same into Court, and without any deduction for attorney's fees or expenses that the association may have incurred in its collection. (*Post, p. 370.*)

6. CHANCERY PLEADING AND PRACTICE. *Refusal of leave to file: amended and supplemental bill not erroneous, when.*

The Chancellor, in refusing complainant leave to file an amended and supplemental bill presented four and one-half years after the filing of the original bill and answer thereto, does not. constitute such abuse of discretion as demands reversal by this Court. (*Post, pp. 370, 371.*)

FROM SHELBY.

Appeal from Chancery Court of Shelby County... JNO. L. T. SNEED, Ch.

W. A. COLLIER and JOHN JOHNSON for Johnston.

SMITH & TREZEVANT for Grosvenor.

McALISTER, J. Complainant, on July 13, 1895, filed this bill to enjoin the sale of certain real estate in the city of Memphis, which had been conveyed by her to Chas. N. Grosvenor, trustee, by trust deed, to secure a certain loan of money due the Clerk's Building Association of Memphis. The theory of the bill is that upon a fair settlement with said building association, she is not indebted to it in any amount. Complainant further charges that about 1886 said association ceased to do a building and loan business, for which it was organized, and since that time has virtually been in liquidation; that it had few, if any, meetings of its stockholders or directors, and had no organized board of directors or official place of business, and had long since ceased to be a going concern. It was further charged that when complainant subscribed for her stock she was assured it would reach a par value, probably in eight, and certainly in ten, years; that her two notes aggregated $1,800, but that she had received thereon less than $900; that she had paid into said association double the amount she had received, and yet it was claimed by said association she still owed it $1,304, with interest, since October, 1893.

Complainant further alleges that said association

is only entitled to collect the actual amount received by her, with interest, less whatever complainant may have paid into its treasury on account of dues, interest, or otherwise. Complainant prayed that said association be required to answer fully and give the amount of its capital stock in 1884 and now; that it report its assets and liabilities; that it state its present officers, when it had its last meeting of stockholders, and who was present at such meeting; that it show its income and expenses, its withdrawing stockholders and the amount paid each, and that her notes be brought into Court and canceled.

The defendants answered the bill admitting that complainant was owner of nine shares of the capital stock of the par value of $1,800, but averring that she had been paid thereon the sum of $1,340, the premium on said two loans being $460. The answer admits that at the time Mrs. Johnson ceased paying, in November, 1890, all of the non-borrowing members had withdrawn, or had given notice of withdrawal, excepting three, and all borrowing members had done likewise save four.

It is admitted that the association has not made a loan since 1886, but it is averred that it has, nevertheless, continued to use its corporate franchises, and has been receiving the monthly payments of dues and other debts. Respondent denies that Mrs. Johnston was assured that her stock would reach par in eight or ten years. It denies

that it has no legally organized board of directors, or that it has long since ceased to be a going concern. Respondent denies all the material allegations of the bill.

Proof was taken, and upon the hearing the Chancellor decreed in favor of the defendant association, and ordered a reference to the Clerk to ascertain and report amount due on the principles stated in *Hargo* v. *Rogers,* 8 Pickle, 35. The Clerk reported the sum of $1,280 due from complainant, excluding all payments made by her on the stock. Accordingly the report was confirmed, the injunction dissolved, and the trustee ordered to sell the property for the satisfaction of said decree.

Complainant appealed and has assigned errors.

The first assignment is that the Chancellor erred in holding that this case was controlled by the principles announced in *Hargo* v. *Rogers,* and that said decree was clearly erroneous in not giving complainant credit by dues and payments on stock.

The second assignment is that the association, having held no meetings, made no loans, ceased to do business and abandoned its organization since 1886, it was error in the Chancellor to hold complainant liable for more than she actually received from said association, and in refusing to give her credit by all sums paid, whether as dues or interest, or otherwise.

The third assignment is that the Chancellor was

in error in decreeing a foreclosure of the first deed of trust, because the same was barred by the statute of ten years.

The fourth assignment is that the Court erred in refusing to permit complainants to file an amended and supplemental bill, etc.

The facts necessary to be stated are the following: In 1884 complainant subscribed for seven shares of the stock of said association, of the nominal value of $200 per share, making $1,400. In 1885 she subscribed for two additional shares, making $400. Under the by-laws of the company, she was required to pay for this stock at the rate of one dollar per share, per month, making nine dollars per month on the whole stock. In April, 1884, complainant, by competitive bidding, borrowed of said association, on seven shares of her stock, the sum of $1,400 (less the premium of $350), for which she executed a deed of trust on two store houses on Poplar street, in Memphis, to Chas. N. Grosvenor, trustee.

Complainant was expected to continue the monthly payments of dues, and 6 per cent. interest, upon the $1,400, until such payments, augmented by the interest of the borrower in the profits to be earned by the association, should reach the valuation of $200 per share. It appears that Mrs. Johnston's subscription was to a series issued eight months prior to that time, and it became necessary for her to pay the arrearages on that stock,

Johnston *v.* Grosvenor.

.amounting to $56. This amount, together with the insurance, and other items of expense, were deducted from her loan. The account stood as follows: Amount to be loaned, $1,400; premium on '7 shares, at $50 per share, $350; net result to Mrs. Johnston, $1,050. The statement given her by the Secretary, and pasted in her pass book, shows that this money was paid out to and for her, as follows:

MEMPHIS, TENN., April 29, 1884.

| | |
|---|---:|
| Seven shares of stock, September to May, '87 . $ | 56 00 |
| Cost of abstract ...................... | 53 00 |
| One month's interest .................. | 7 00 |
| Recording trust deed .................. | 3 00 |
| Paid Handwerker for investigating taxes.. | 5 00 |
| Paid Trezevant ....................... | 21 00 |
| Cash handed you this day............. | 500 00 |
| | $ 645 00 |
| Amount your credit loan................ | $1,050 00 |
| Amount paid you ...................... | 645 00 |
| Amount still due you.................. | $ 405 00 |

Mrs. Johnston admits that she received the $500, and we find that the other .items stated in her pass book, and which were paid out for her, were proper charges.

The sum of $405 was retained by the Secretary, as indemnity, against delinquent taxes on this property, which Mrs. Johnston agreed to pay. It further appears that in March, 1885, Mrs.

Johnston *v.* Grosvenor.

Johnston subscribed for two additional shares, and borrowed upon them, at a premium of $55 per share, netting her the sum of $290, which she received in cash. Complainant makes no complaint in her bill about the second loan. She executed her note for $400—the nominal value of the two shares of stock, and also a second mortgage to Grosvenor, trustee, on the Poplar street property. It further appears that the taxes on the property, for which the $405 was retained, were not paid by Mrs. Johnston, and that current taxes were being neglected. Complainant was in possession of the property and receiving the rents until 1895, when a receiver was appointed.

The tax abstract on file shows an indebtedness of about $800 for taxes, interest and penalties.

The association, through its secretary, rendered the following statement, showing how said $405 had been disbursed, to wit:

Paid W. A. Collier, complt's attorney.....$131 85
Dues and interest ....................... 77 00
S. & C. taxes, 1884...................... 22 70
T. D. taxes, 1885........................ 47 00
People's Insurance Co. ................... 27 25
W. L. Parker ............................ 23 20
Dues and interest ....................... 76 00

                               $405 00

The only items of this account challenged by Mrs. Johnston were those of seventy and seventy-

six dollars, respectively relating to dues and interest. She claimed she had paid these items herself, and her contention was sustained by the Master, and she was allowed this credit.

It appears that after these two loans had been running, between five and six years Mrs. Johnston ceased to make any further payments, and at the date of the filing of the bill it was claimed she owed $1,300. Her last payment was made in November, 1890.

It appears the company owes no debt, excepting a balance of $2,900, due to thirteen nonborrowing shareholders, who have been paying their monthly contributions, looking to the expected maturity of their shares for reimbursement.

It is admitted that the company's resources have been exhausted, and this debt against Mrs. Johnston is its only asset. The company owes no money to outside parties, and is not insolvent in that sense, but it is admitted this is immaterial for the purpose of ascertaining the mode of settlement.

It is claimed by counsel for Mrs. Johnston that she has paid back more money than she received.

She received on first loan..............$1,050 00
She received on second loan............  290 00

Total .... ........................$1,340 00

It is shown by her pass book that she paid back, on

Johnston *v.* Grosvenor.

First  loan ................................$  987  00
She  paid  back  on  second  loan.......... 204  00

Total ....  ............................$1,191  00

But  $622  of  these  payments  were  made  on
stock.   The  rule  laid  down  in  *Hargo* v. *Rogers,* 8
Pickle, 35, excludes  any  credit  on  mortgage  debt  of
payments  made  as  dues  on  stock.   But  such  pay-
ments  stand  to  credit  of  borrower  on  books  until
time  for  final  adjustment,  when  all  stockholders,
borrowers  and  nonborrowing,  will  be  paid  *pro
rata*  from  the  fund  for  ultimate  distribution.

It  is  next  insisted  that  the  deed  of  trust
sought  to  be  foreclosed  is  barred  by  the  statute
of  ten  years.   The  deed  of  trust  was  executed  in
1884,  and  no  foreclosure  was  sought  until  1895.
*McElwee* v. *McElwee,* 13  Pickle,  649;  *Romells* v.
*Jacobs,* 16  Pickle,  397.   A  conclusive  answer  to
this  position  is. that  no  definite  time  is  fixed  in
this  deed  of  trust  for  the  maturity  of  the  debt.
It  is  true  the  note  secured  by  the  trust  deed  is
dated  in  1884,  and  is  payable  one  day  after  date,
but  under  the  scheme  of  building  and  loan  asso-
ciations  it  was  not  expected  that  the  note  would
be  paid,  or  the  debt  mature  at  once.   The  agree-
ment  of  the  mortgagor  is  to  make  his  monthly
payments  until  the  stock  matures,  and  he  under-
takes  to  secure  the  payment  of  a  series  of  small
sums  during  an  indefinite  period.

"Since  a  building  association  loan  is  intended

Johnston *v.* Grosvenor.

not to be repaid, but to be extinguished by the maturity of the borower's stock, it does not fall due until that event occurs, unless there is a default in the payment of dues, interest, or other charges, or the association becomes insolvent, or is dissolved, thus creating a breach of the contract, and consequently the mortgage given to secure the loan cannot be foreclosed except upon the happening of one of these events, for if the stock matures without default the loan and mortgage are *ipso facto* extinguished, and there can be no foreclosure," etc. Am. & Eng. Decisions in Equity, Vol. 5, page 264, note 10.

It is not pretended in this case there was any default in the payment of dues and interest by the mortgagor until November, 1890, nor is it shown that the association became insolvent prior to 1888, nor that the borrower's stock had matured. The attempted foreclosure *in pais* of this mortgage was made in 1895.

It is next insisted that this association had become insolvent in 1886, and had abandoned its corporate functions and purposes. The argument is then made that complainant was thereby released from any further liability as a member, either for payment of dues, or interest, or loan. The law on the subject is "that the insolvency of a building association, which is that condition of its affairs in which it is unable to pay back to its members the amounts paid in by them, respect-

ively, dollar for dollar, puts an end at once to its operations, and as it thus prevents the stock from maturing and extinguishing the loans, according to the contracts between the association and its borrowing members, constitutes a breach of those contracts, and on the one hand excuses the borrowers from all further liability for the payment of dues and fines, and on the other renders the mortgages given to secure the loans due and enforceable at once, without regard to their terms, even though payable in installments, and the receiver can proceed to collect them, etc. 5th Am. and Eng. Decisions in Equity, page 278, note 20, citing many authorities.

Under the title, "Effect of Dissolution, or its Equivalent upon Membership Duties and Borrowers' Obligations," at Article 523, Mr. Endlich says:

"A dissolution, strictly speaking, of the association, of course, at once putting an end to all its corporate business, terminates the liability of members to continue the prescribed regular stock payments. Where that dissolution occurs in a contemplated course of events, no serious question can arise as to its effect upon the rights or duties of any class of members, but where it occurs prematurely the case is different. For the purpose of discussion of the questions thus arising, no distinction need be made between the dissolution properly and technically so called, and one practically resulting from the agreement of members or the insolvency

of the association. In every case the effect upon the members is to stop at once any liability for further regular payments.

"The dissolution of the building association necessarily puts an end, not only to its capacity to receive, from time to time, his small payments, but also to the possibility of their being turned to account, for his benefit, by means of the system of investment and reinvestment peculiar to the building association scheme. The main feature which has made his undertaking bearable, and in reliance upon which he has been induced to assume its obligations, is thus taken away, and it follows as an inevitable consequence that he cannot be held to its precise terms. His duty to make regular stock payments, a duty incident to membership only, ceases, for the stock itself is destroyed, there being no longer a corporation as to whose stock it can figure, and the membership dies with the corporation. So far as the mortgage was given to insure the performance of this membership duty, the obligation is abrogated by the destruction of the stock and the society. The imposition of fines, a species of liquidated damages, due the society, under its system of mutuality for the neglect of a membership duty, must, of necessity, fall away when the membership is gone, when there is none who can justly claim the damages, and when their exaction would be nothing more nor less than the enforcement of penal-

ties not countenanced by the law. The agreement to pay a premium for the loan, justified upon the basis of strict mutuality, and bearable by reason .of the length of time allowed for its liquidation, and, by the fact that it would, according to the intent of the contract when entered into, be in part made up by profits upon the stock payment and interest discharged by the borrower during the projected continuance of the association, as well as by similar payments made by other borrowers during the like period and the gains and accumulations of the entire corporate business to the day of its contemplated termination, must, when that mutuality is taken away, and all the other elements embraced in the terms of its assumption removed, fail for want of a proper consideration, at least it fails in part.

"The insolvency of the company, as before observed, puts an end to its operations as a building association. To a certain extent, it also· ends the contract between it and its members, respectively, and nothing remains but to wind it up in such a manner as to do equity to creditors and between the members themselves.

"The liability to pay monthly dues or fines or interest, on the amount advanced cannot extend beyond the existence of the association. . . . It would be most inequitable to oblige one party or those holding by assignment his interest, to continue to make the payments required of him by the con-

tract, while the other party had incapacitated itself from carrying out the provisions made in the same contract for ascertaining the extent of the mutual obligations of the parties and for securing the performance thereof on its part."

In Am. and Eng. Enc. Law, 2d Ed. Vol. 4, page 1081, it is said, viz.: "All authorities agree that on the premature abandonment of the enterprise, from whatever cause, the original contract between the association and the borrower cannot be carried out, and that neither party is therefore bound to a literal fulfillment."

What, then, is the application of these principles in the present case? Counsel for the association states that it makes no claim of solvency, but denies that its organization has been abandoned. The record discloses that the association was incorporated in 1875, and down to 1884 issued fourteen different series of stock. It matured many of them and paid out thousands of dollars to stockholders. It had done an active business down to 1886, when it made its last loan.

The income of the association from dues and interest payments began to decline from September, 1885. At that date the secretary claims there were 1,133 contributing shares outstanding, but he admits the income from dues was only $751 in September, 1888, the income from said source was reduced to $545, in 1889 to $264, in 1890, when

complainaint ceased paying, the income was $150. In 1888 all the officers and directors of the association had either withdrawn or given thirty days' notice of withdrawál. Under the charter of the association, members not advanced, are entitled to withdraw their contributions and profits upon giving thirty days' notice of their intention to do so.

No fraud or bad faith on the part of the officers or directors of the company is shown, although charged and reiterated many times in the brief.

Complainant continued to pay her dues and interest regularly until November, 1890. At the time she ceased paying all of the nonborrowing members had withdrawn or had given notice of withdrawal, excepting three, one of whom owned ten shares, and continued to pay thereon until July, 1892; another, owning five shares, paid until December, 1891; and a third, owning five shares, ceased to pay thereon in January, 1893. It is further shown that four borrowing members continued to pay dues and interest after Mrs. Johnston stopped, and three of them have since been paid in full, while the fourth has received nearly his full quota. At the date of the answer filed herein there were thirteen unpaid nonborrowers, owning ninety-three shares of stock, upon which partial payments had been made, leaving due them about three thousand dollars ($3,000). It ap-

pears that the only assets of the association are the mortgage loan against this complainant, and a lot worth about $300, bought in under a foreclosure.

It appears that in October, 1888, the board of directors, passed a resolution that all delinquents for dues or interest be placed in the hands of the attorney for collection, and under this resolution the attorney has since acted as liquidator of the association, collecting assets and distributing them in accordance with the charter and by-laws of the association, faithfully and efficiently. Prior to 1887, the attorney had been paid a salary of $50 per month. In 1887 it was reduced to $20 per month, and in 1888 the salary was discontinued altogether. The salary of the secretary was also stopped at that date, and no salaries have been paid since 1888. While the association had not made a loan since 1886, it has, since that time, been receiving monthly payments and collecting other debts due it and paying off its unsatisfied borrowers.

We are constrained to believe, from the foregoing facts, that this association was insolvent in October, 1888, and had practically abandoned the business for which it was incorporated. At that date it virtually went into liquidation, and there was no further obligation upon members to continue the payment of dues and interest, since in-

21 p—24

solvency would prevent the stock from maturing and extinguishing the loans according to contract.

The complainant was under no obligations to pay dues and interest after October, 1888, but she continued to pay until November, 1890, ignorant of the true financial condition of the company. The insolvency of the association was known to its officers and unknown to the complainant. She was not liable for dues and interest after October, 1888, and is now entitled to recover said amounts, with interest, or to have them credited on her mortgage loan. In the statement of account by the Clerk and Master, the complainant is charged with interest on her mortgage loan from the time it was made. This is, of course, proper, under the Hargo rule. It is conceded by the counsel for the association that complainant is entitled to share in the distribution of amount due on her mortgage loan, but it is insisted she must first pay balance due, and after expenses and attorney's fees are collected, she will get her *pro rata* of this fund.

We think she is entitled to this *pro rata* before expenses of collection are deducted, and this amount will be credited on balance due by her.

On the basis indicated the account will be recast. There was no abuse of the Chancellor's discretion in refusing to permit the amended and supplemental bill to be filed. The original bill herein was filed July, 1895, and the answer

Johnston *v.* Grosvenor.

August, 1895, while the amended bill was not offered until January, 1900. The costs of the appeal will be paid by the building association. The costs of the Court below will remain as taxed by the Chancellor.