GEORGE R. CARTER

*v.*

MARTIN G. LOVE *et al.*

*Opinion filed December 16, 1903.*

1. PRINCIPAL AND AGENT—*agreement that an agent shall have all he can make on land above fixed price is valid.* In the absence of fraud, an agreement that an agent shall have as compensation for the sale of land all that he can obtain over a certain price is conclusive upon the parties.

2. CONTRACTS—*when objection that contract was unilateral does not prevent specific enforcement.* An objection that an option contract to sell land was unilateral does not preclude its specific performance, where its terms were accepted within the time limited and before the option was withdrawn.

3. SAME—*when filing bill to rescind does not prevent tender of performance.* If the terms of an option contract to sell land are accepted, the vendor can not prevent a tender of performance by the vendee by filing a bill to rescind the contract before the expiration of the time stipulated in the contract for such performance.

APPEAL from the Circuit Court of Whiteside county; the Hon. FRANK D. RAMSAY, Judge, presiding.

SAMUEL J. HOWE, for appellant.

C. L. & C. E. SHELDON, for appellees.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

About January 10, 1902, appellant, George R. Carter, a resident of Chicago, received a letter from appellee Martin G. Love asking whether his farm of one hundred and twenty acres, near Tampico, in Whiteside county, was for sale. On January 14 Carter replied that the farm was not on the market, but if he could get $77 per acre, net, he would sell, and did not want all cash. Love went from his home at Tampico to Chicago, and on January 20 met Carter. After some negotiations they agreed upon the terms of a contract, and Love asked Carter if he had

any one he wanted to go to to have the contract drawn. Carter suggested that Love draw the contract, and he took a printed form, in which he made some changes, striking out a provision for a commission of one dollar per acre to be allowed him for the sale of the farm, and making the contract correspond with the agreement of the parties. Carter read it over, and being satisfied with it, signed it.    It was as follows:

"This indenture, made and entered into this 20th day of January, A. D. 1902:

"*Witnesseth,* That I, G. R. Carter, of Chicago, county of Cook, State of Illinois, in consideration of one dollar to me in hand paid by M. G. Love, of Tampico, county of Whiteside and State of Illinois, do grant to him, M. G. Love, the sole option to purchase the following described piece, parcel or lots of land of which I am the owner thereof, namely, one hundred and twenty acres of land one mile south-west of Tampico, Ill., now occupied by John Nelson, $1000 to be paid March 15, 1902, $8240 to be paid March 15, 1903, if purchased M. G. Love or sold by M. G. Love to another party. Now, if the said M. G. Love shall at any time before the expiration of this option so desire, I agree, in consideration of the sum of $9240, to convey to said M. G. Love, or as he shall direct, the above described premises by clear warranty deed and good abstract of title. The above described property is not encumbered. For the faithful performance of the above agreement I bind myself in the penal sum of $500, to be paid said M. G. Love if I fail to fulfill this agreement. I agree that if said M. G. Love be the cause of any person or persons purchasing the said above described property, that he shall be and is entitled to a commission of all over $77 per acre on farm. I also agree that if, before the expiration of this option, I fail to notify said M. G. Love to the contrary, this option shall be considered renewed on same terms per purchase for one year, hereby binding myself, my heirs, my administrators or assigns for the fulfillment of this agreement at any time during the period of fifty-three days after date first above written.

"I have hereunto set my hand.

G. R. CARTER.    [Seal.]"

Carter told Love that after writing him he had received a letter from Mahlon Fell, at Tampico, asking if the farm was for sale, but had not answered the letter.

He wrote to Fell stating that the farm was not for sale. On his return to Tampico, Love entered into negotiations with Fell for the sale of the farm to him when he should obtain title from Carter, and entered into a contract to sell Fell the land at $85.50 per acre, out of which he was to rebate $400 for delay in delivering possession until the expiration of a lease of the farm to John Nelson. Fell deposited in the Tampico Bank $1000 to apply on the contract, and the bank addressed a letter to Love stating that the $1000 had been deposited. On January 30 Love went to Chicago, taking this letter with him, and told Carter that he would take the farm at Carter's terms, or that he had sold it and would take it as agreed, and in response to an inquiry from Carter he said that Fell would eventually get the farm. Carter criticised the character of the letter from the Tampico Bank, stating that it should have been addressed to him instead of Love, but he made no objection to carrying out the trade, and with his wife he made and acknowledged a warranty deed of the farm to Love. He also gave Love the following writing:

"CHICAGO, ILL., *Jan. 30, 1902.*

"I hereby agree with Martin G. Love to leave $6000 of a loan secured by mortgage on the premises in Tampico township, Whiteside county, Illinois, conveyed by me to him, and that this sum of $6000 in loan so left will be accepted as a part of the purchase price to me to be paid by him. Interest at five per cent per annum, dating from March 1, 1902.

GEORGE R. CARTER."

The deed and writing were by agreement of Carter and Love enclosed in an envelope and mailed to the Bank of Tampico, to be held until the mortgage should be executed and the rest of the purchase money paid. On February 3 Carter wrote Love that he had sent to Morrison for the abstract, and as soon as received he would send it and the lease. On February 4 Carter received a letter from Love enclosing a draft for $1000 to apply on the purchase of the farm, and requesting Car-

ter to mail the abstract and the lease assigned to him to the Tampico Bank and then he would assign the lease to Fell. On February 6 Carter acknowledged the receipt of the draft and said he would send the abstract as soon as it was returned from Morrison. On February 7 Love wrote to Carter acknowledging the receipt of his letter of the 6th and asking him to forward the abstract as soon as possible, saying it must reach him before March 1, and stating that he had papers made from Fell and wife direct to Carter for $6000, due in five years, with interest at five per cent, and had written Fell $700 insurance for five years, loss payable to Carter. Carter had not cashed the draft, and on February 13 he went to the Tampico Bank and was shown the note and mortgage from Fell and wife to him. He said he was not satisfied with the form of the papers. He thought his deed should run direct to Fell or else the mortgage should have been made by Love, as there was no deed from Love to Fell. By agreement the papers were then sent by the Tampico Bank to the First National Bank of Chicago for inspection. On February 17, thirteen days after receiving the draft from Love, Carter wrote the Tampico Bank that after examination of the papers he could not approve them, and he returned the draft. He also wrote Love requesting him to come to Chicago. Love declined to do so, and on February 22 Carter telegraphed him to meet him at the Tampico Bank the following Tuesday. Carter went to Tampico and saw Love on February 25, and then served notice on the bank not to deliver the deed deposited for Love. On the next day, February 26, Carter filed his bill in the circuit court of Whiteside county against Love, Fell and the banker, Glassburn, asking for an injunction against placing anything on record to cloud his title, and praying that his contract of January 20, and the memorandum relating to the $6000, should be canceled as having been procured by fraud; that Fell should be decreed to elect whether he would take the

land from Carter at the price he was to pay Love, and that if he elected not to do so he should be barred from claiming any title to the lands. On the next day, February 27, Love, with his wife, executed a note and mortgage for $6000, payable to Carter, in accordance with the memorandum, and deposited it in the Tampico Bank for Carter. On March 1 Love deposited the cash payment of $3240 and notified Carter that he had complied with the conditions of the contract. The defendants answered the bill, and Love and Fell filed cross-bills. Love's cross-bill set up the contract and sought a specific performance of it, praying that the bank should be decreed to deliver the deed from Carter to him and deliver the money and notes to Carter. Fell's cross-bill asked that his contract with Love should be carried out. Carter answered the cross-bills, and the issues were referred to the master in chancery, who took the evidence and reported the same with his conclusions, to the effect that Love was not the agent of Carter in the transaction, but that he had an option to purchase the lands at $77 per acre; that there was no fraud or misrepresentation and the transaction was fair; that Love was entitled to the deeds and Carter to the notes and money in the bank, and that the optional contract was for a good and valuable consideration and was not revoked by Carter. He recommended a decree in accordance with the prayer of Love's cross-bill, and also that Fell should pay the purchase price to Love, and Love should convey subject to the $6000 mortgage. The court overruled exceptions to the report, except so far as it related to a conveyance by Love to Fell, and entered a decree dismissing Carter's bill and Fell's cross-bill and granting relief to Love on his cross-bill. The decree ordered the bank to deliver the deed of Carter to Love, and to deliver the money, note and mortgage to Carter.

The first proposition stated for appellant is, that Love was Carter's agent, and therefore could not take

advantage of his agency to make a profit for himself over and above his compensation. If it should be admitted that Love was Carter's agent it must also be conceded that he did not make a profit for himself over the agreed compensation. It is true that one who acts as agent for another in the sale of land has no right to speculate upon the subject of the agency at the expense of his principal. He will not be allowed to put himself in a position antagonistic to his principal to whom he owes a duty, and if he sells for a higher price than that limited by his principal he is bound to account for the excess over and above his own charges and commissions. (*Merryman* v. *David*, 31 Ill. 404; *Kerfoot* v. *Hyman*, 52 id. 512.) But where there is no fraud the compensation may be agreed upon in any manner or to any amount by the parties. It is not uncommon to agree that an agent shall have as his compensation all that he can obtain over a certain fixed price, and in the absence of fraud such an agreement is conclusive upon the parties. In this case the proposition of Carter in his letter was, that he should receive $77, net, per acre, by which he would not be liable to any commissions, and when the contract was entered into, the provision for a commission was stricken out of the blank form. The contract explicitly provided that in case Love should be the cause of any person purchasing the property he should be entitled to all obtained over $77 per acre. Carter testified that Love told him he thought he was asking a pretty good price, and thought he ought to make it low enough so that he could make at least fifty cents an acre, and that this made him think that Love was going to act as his agent. If that is so, we do not see what effect it could have upon the agreement that Love should have all that he could realize above $77 an acre. If he was acting as agent he certainly owed nothing to Carter in regard to any enhanced price, but in negotiating a sale was working in his own interest, to get as much as he could as commission. There

are other agreements, however, in the contract having no relation to agency. The contract gave Love an option for fifty-three days to purchase the land at the stipulated price, and Carter agreed, in consideration of the purchase price, to convey to Love or as Love might direct. It is clear that the contract represented the understanding of the parties.

Counsel for appellant says that Carter did not understand that he was dealing with Love as a principal. But that is merely saying that he did not fully understand the legal effect of his contract, which would not justify a court in setting it aside. His testimony, however, shows that he did understand the contract, and it corresponded substantially with his letter to Love that he would sell the farm for $77, net. He was a business man and read over the contract before he signed it, and it cannot be supposed that he did not know that Love had an option to buy the land himself. He testified that he knew Love was engaged in the insurance business and selling farms; but that fact is entirely consistent with the contract by which Love was allowed to sell the farm to some one else or to buy it himself. If Love sold the land to Fell as an agent he was entitled to all that he received above $77 per acre, and if he dealt with Carter as a purchaser he was to have the land at that price. The evidence shows that he availed himself of the option and became a purchaser.

The next proposition of counsel is, that a contract, to be specifically enforced in equity, must be supported by a good and valuable consideration and must be reasonably fair and just, and that the contract of Carter was unilateral and without consideration. If the contract was of that character it would become mutual and capable of enforcement at the instance of either party, upon acceptance of its terms by Love within the time limited and before the option was withdrawn. (*Crandall* v. *Willig*, 166 Ill. 233; *Guyer* v. *Warren*, 175 id. 328.) There

was such an acceptance by Love at least on February 4, when he wrote the letter to Carter sending him the draft for $1000. He had previously, on January 30, told Carter he would take the land on his terms, and Carter made the deed and memorandum, which were mailed to the Tampico Bank for the purpose of completing the sale. In the attempt to so complete it a mortgage was made by Fell to Carter which Carter would not accept, but his objections were to the party named as a receiver and because there had been no conveyance from Love to Fell, and he feared trouble in foreclosing the mortgage. He then knew all about the sale to Fell and made no objection whatever to complying with his contract. There was no fraud, deceit or misrepresentation of any character in obtaining the contract, and Carter's conduct up to the time he repudiated it shows that he fully understood its terms.

It is also urged that Carter had a right to rescind the contract before acceptance; that the filing of the bill was a rescission, and that Love could not thereafter legally perform the contract on his part. As we have already said, there was an acceptance on the part of Love before the bill was filed, and the contract having become legally binding upon the parties, Love had until the first day of March to tender performance. Appellant could not prevent such tender of performance by filing the bill and attempting to rescind the contract. The mortgage was made by Love and wife on February 27 and the cash payment was made on March 1. This was a full compliance with the contract, and he thereupon became entitled to the deed in the possession of the bank.

The decree is affirmed.                *Decree affirmed.*