STATE *ex rel.* McCORMACK, COM'R OF INSURANCE AND BANK-
ING *et al. v.* AMERICAN BUILDING & LOAN ASS'N *et al.*

(*Nashville,* December Term, 1940.)

Opinion filed May 3, 1941.

388

CANALE, GLANKLER, LOCH & LITTLE, HAROLD S. LEEKER, JAMES L. HUTTER, JR., and CEYLON B. FRAZER, all of Memphis, for complainants.

COOPER TURNER, JR., ERNEST WILLIAMS, GEORGE KLEPPER, BARTELS & BARTELS, F. B. GIANOTTI, JR., HARSH, HARSH & HARSH, A. B. PITTMAN, A. E. HORN, R. H. STICKLEY, J. R. WALKER, JR., C. C. CASTLES, KING, TAYLOR & KING, J. R. GILLILAND, PAT J. LYONS, WINSTEAD JOHNSON, GORDON I. GORDON, ROSENFIELD & BOROD, and J. GRANVILLE FARRER, all of Memphis, for defendants.

MR. CHIEF JUSTICE GREEN delivered the opinion of the Court.

In this cause the affairs of the American Building and Loan Association are being liquidated and the questions presented to us involve the proper distribution of its assets among its stockholders. The matter received careful investigation at the hands of the chancellor and of the Court of Appeals and the two courts agreed for the greater part in their views. Although we found ourselves in harmony with most of the conclusions of the

other courts, owing to the magnitude and variety of the interests affected and the importance of the outcome to the members of the Association, we granted all petitions for *certiorari* and have heard argument with respect to all rulings of the Court of Appeals that have been appropriately challenged.

The American Building and Loan Association was organized in May, 1889, under section 14 of chapter 142 of the Acts of 1875, the general corporation statute. Under that statute the Association was authorized to issue installment stock only. Chapter 12 of the Acts of 1893 authorized building and loan associations to issue prepaid stock and paid-up stock, and in April of that year the charter of the defendant Association was amended to obtain for the Association this privilege.

The by-laws of the Association provided in detail for the issue of installment and paid-up shares. All such shares were subject to call for payment and cancellation after five years from the date of issuance.

The by-laws provided that the monthly payments on installment shares, described as Class A, should be 50c on each $100 share and a fine was provided for delinquency.

With respect to paid-up shares, the by-laws provided that the member should pay $100 per share for the same at the time of the subscription; that the holders of such shares should not receive dividends in excess of 6% per annum, which dividends were payable semi-annually, but it was provided "in no case shall dividends be paid in excess of the net earnings." The paid-up shares herein issued called for interest at the rate of 5% per annum.

For more than thirty years after the organization of defendant Association its business prospered. Dividends were declared semi-annually, holders of installment stock frequently being credited with dividends amounting to

8% per annum. Dividends of 5% per annum were regularly paid to the holders of paid-up shares, they, under their contract with the Association, not being entitled to any further share in the profits of the business.

Owing to the depression in the value of real estate, the assets of the defendant Association consisting of mortgages on real estate had depreciated by 1932. A further depreciation followed during the next four or five years, although dividends were still declared up until 1936. The Association by this time was in serious difficulties and was under close scrutiny of the State examiners. Certain steps were taken to ameliorate these difficulties. Just here it is sufficient to say that the present bill in the name of the State on the relation of the Commissioner of Insurance and Banking and the Attorney General, an insolvency bill, was filed in January, 1937, and a receiver appointed for the Association on January 16 of that year.

The debts of the Association have been paid. Assets are about $2,000,000. Outstanding stock claims are about $3,000,000, for about $1,700,000 of which priority of payment is sought. The chief controversy to be determined is between the installment stockholders and the paid-up stockholders as to whether the latter are entitled to preference in the distribution of the assets of the concern. Certain groups or individuals seeking preferential payment assert equities peculiar to themselves. These equities not being the same as to all groups or individuals, separate consideration of the rights of several claimants is required.

The general plan and purpose of organizations like defendant Association is familiar and has been frequently elaborated by this and other courts. There is nothing unusual in its charter or by-laws.

The primary object of such an organization is to en-

list as its members wage earners and people of small means, and by a compulsory system of savings, enforced by dues exacted and fines for delinquency, to accumulate a sufficient fund to the credit of each member to enable him to become the owner of a home. Originally these associations' issued installment stock only. Quite commonly the members would obtain loans from the association to apply on the purchase of homes, borrowing on their stock and also securing the loans by mortgages on the real estate purchased. These loans would be satisfied by the accumulation of dues and dividends and the stock that had been issued to the borrowing members would be retired and the mortgages satisfied.

The reason for extending membership in such associations to paid-up stockholders was to enable the institutions to obtain more funds to lend to its borrowing members. A paid-up member has the right to vote and participate in the direction of this institution's affairs. He shares in the profits of the association. When there is a net profit applicable to dividends he receives 5% on his stock. Out of the remainder of such net profit applicable to dividends, the installment stockholder gets what is left.

The courts all stress the co-operative nature of building and loan associations. They have been likened to partnerships. They are mutual organizations. Each member or stockholder undertakes to share the profits and the losses. This court has said of such enterprises ''one of the leading features was that the members were kept upon a strictly co-operative basis, with mutual advantages and benefits;'' and again, ''Strict mutuality and equality of benefits and obligations must be kept the groundwork and basis of these associations, and if they are not so founded, they are not truly building and loan

associations entitled to the protection given such associations by the statute;" *McCauley* v. *Workingman's Building & Saving Association*, 97 Tenn. 421, 429, 431, 37 S. W. 212, 214, 35 L. R. A. 244, 56 Am. St. Rep. 813; and the court has further said, "The theory on which associations like the present are organized, and the rule of law as applied to them by all the cases, is that they are mutual in their character, and the members share in the common gains and losses;" *Province* v. *Interstate Building & Loan Association*, 104 Tenn. 458, 58 S. W. 265, and finally, "Building and loan associations . . . were based upon the principle of mutuality. Without this feature, they would not be tolerated for one moment." *State ex rel.* v. *Folk*, 124 Tenn. 119, 135 S. W. 776, 778.

Taking up the claims of the shareholders to preferential treatment in the apportionment of the assets of this insolvent institution, we first consider the rights of

### THE PAID-UP SHAREHOLDERS.

Such members cannot be regarded as creditors. Our statutes under which this Association was created and functions repel the idea. Although for a time the issuance of paid-up shares was not sanctioned by our laws, all the while the defendant Association was authorized by its charter and the statute "To borrow money, and issue notes or bonds upon the faith of the corporate property, and also to execute a mortgage or mortgages as further security for repayment of money thus borrowed." Section 5, chapter 142, Acts 1875, Shannon's Code, sec. 2054(7). It is apparent therefore that chapter 12 of the Acts of 1893, empowering building and loan associations to issue paid-up shares was not enacted to permit such associations to float an indebtedness and issue evidences thereof. Such power already existed.

■ Section 1 of chapter 12 of the Acts of 1893, carried into Shannon's Code at Sec. 2175, runs as follows:

"Said association may issue stock in different series, provided the par value of the shares shall not exceed two hundred dollars, and provided no person shall own more than one hundred shares of stock of the par value of two hundred dollars. Said association may issue installment stock, to be paid for in periodical sums, and prepaid and paid-up stock, upon which a gross sum shall be paid in advance in cash, as may be prescribed by the by-laws; and cash dividends may be paid on the said stock authorized to be issued, out of the net earnings, as the by-laws may prescribe, provided such dividends shall not exceed the per cent. of profits earned. Every share of stock shall be liable for and subject to a lien for the satisfaction of any unpaid installments and other proper charges, such as fines, premiums, and interest on loans."

Obviously a certificate of stock, installment or paid-up, authorized to be issued by this statute, was not an evidence of debt but an evidence of a share in the enterprise, a return on which was subject to the adequacy of the profit from the business, and the value of which was measured by the association's net assets.

In other words, the object of the quoted provision of the Act of 1893 was to enable a building and loan association by the sale of paid-up stock to increase its capital, not to afford such an association a devious method of obtaining a loan.

The contention made for them is that the contracts of the Association with the holders of the paid-up stock, taken in connection with the surrounding circumstances, were in effect "promises to pay" entitling the holders to preferential rights in distribution of the assets.

█ We find nothing in its articles of incorporation permitting the Building and Loan Association to make such a discrimination between its members. The paid-up shareholder and the installment shareholder are alike members of the Association. Certificates to either class are described as *stock* in the Act of 1893. As stockholders each class enjoys the borrowing privileges and other privileges of membership, and each class has equal rights to participate in their votes in the direction of the Association's business. There is nothing in the law which empowers such mutual associations as defendant Corporation to relieve one class of its members of the hazards of its business at the expense of the other class. It is a trite saying that a corporation has only such powers as are granted or necessarily implied from those expressly granted.

█ Bearing in mind the reciprocal and mutual character of the relations between the members of a building and loan association, the conclusion is inevitable that upon dissolution of such an institution each member is entitled to share in the capital according to his contribution thereto. To the paid-up subscriber, a ratable share of his lump contribution, to the installment subscriber, a ratable share of his contribution in dues and dividends. It is not to be forgotten that the paid-up shareholders' dividends did not go into the capital of the corporation, as did the installment share-holders' dividends, but were withdrawn and paid to the former.

It might be suggested that the discrimination here urged in favor of the paid-up shareholders is particularly obnoxious when we consider the fact that such a discrimination would work against the very class for whose benefit these associations were conceived and endowed with special privileges.

■ Speaking generally, therefore, we think no preference can be allowed to those holding paid-up shares over those holding installment shares in a building and loan association organized under the laws of Tennessee. Indeed, this court has so held.

In *Post* v. *Building & Loan Association,* 97 Tenn. 408, 37 S. W. 216, 218, 34 L. R. A. 201, claims for preference were made in the distribution of the assets of an insolvent association in favor of stockholders who had paid their dues in advance "under an agreement with the association that interest should be allowed upon such advance payments until absorbed by dues." The agreement further provided that these subscribers should be treated as creditors of the association and the amounts advanced be repaid to them as loans with interest. This court said:

"Such a proceeding is not warranted by the charter or the proper scope and scheme of a building and loan association. . . . To allow the amounts advanced to be paid back would be to sanction such proceedings as legitimate loans, to convert capital into loans, and to create preferred stock, in order to work out supposed equities. We think the proper holding upon this matter is to treat the advances as payments upon stock, and not as loans to the company; and this is, in effect, carrying out the intention of the parties, which was to pay up their stock in advance, and, by anticipation of its maturity, receive a discount by so doing."

There is no difference in principle between buying paid-up shares at a discount, to be paid in full at maturity, and buying paid-up shares at par, interest thereafter to be paid until maturity. In the first case interest is merely paid in advance.

While there is some conflict in the decisions, we think the decided weight of authority is that upon the insol-

vency of a building and loan association, holders of paid-up stock, although a dividend at a designated rate is provided (in return for which they waive the right to any further share in the profits) are placed on a parity with ordinary or installment stockholders without any preference over them. The text-writers are in accord to this effect. 9 Am. Jur. 179; 12 C. J. S., Building and Loan Associations, Sec. 116, p. 539; Sundheim Building and Loan Associations (3rd Ed.), Sec. 193; Braver, Liquidation of Financial Institutions, Sec. 1303.

Such is the rule where, as here, there is no provision in the certificate of paid-up stock, or in the articles of incorporation, or by-laws, or statute, entitling the holders of such stock to a preference.

Some of the leading cases stating the law as above are *Coltrane* v. *Blake*, 4 Cir., 113 F. 785; *Gibson* v. *Safety Homestead & Loan Association*, 170 Ill. 44, 48 N. E. 580, 39 L. R. A. 202; *Leahy* v. *National Building & Loan Association*, 100 Wis. 555, 76 N. W. 625, 69 Am. St. Rep. 945; *Sumrall* v. *Commercial Building Trust's Assignee*, 106 Ky. 260, 50 S. W. 69, 44 L. R. A. 659, 90 Am. St. Rep. 223. Other cases are collected in a note, 98 A. L. R. 129.

From previous reference to our statutes and the charter and by-laws of defendant Association it is manifest that nothing in these instruments confers upon the paid-up shareholders in this institution preferential rights in distribution of its assets. Neither do we find anything in the contract entered into between the Association and the paid-up shareholders which undertakes to give to them any such preference. The contract consisted of the terms embodied in the certificates of stock, together with the charter and by-laws of the Association and the statutes under which it was incorporated, the terms of these latter instruments being presumed to be within the knowledge of

the stockholder. *Miller* v. *Eastern Building & Loan Association*, Tenn. Ch. App., 53 S. W. 231; 9 C. J. 936; 12 C. J. S., Building and Loan Associations, Sec. 22.

We have referred to the charter, the by-laws, and the statutes. The certificates issued to the paid-up stockholders, after the heading, were in form, as follows:

"This Certifies that —— of ——, County of ——, State of ——, is a member of the American Building and Loan Association of Memphis, Tennessee, and has subscribed for and is the owner of Ten Paid Up Shares therein, of the par value of One Hundred Dollars per Share, amounting to One Thousand Dollars.

"This Certificate is issued by the said Association, and is accepted by the holder hereof, upon the following terms and conditions, viz.:

"1. Receipt of One Hundred Dollars per Share is hereby acknowledged, and the holder hereof shall never be required to make any further payment thereon for any cause whatever.

"2. Privilege of withdrawing, at any time after the date of this certificate, on the terms and conditions set forth in the By-Laws on thirty days written notice, shall be allowed the holder hereof, and no admission, withdrawal, or transfer fees, shall be charged; and this Certificate shall not be called in for payment by the Association until after five years from the date hereof; and in consideration of these privileges, dividends shall not be credited to this Certificate in excess of Five per cent. per annum, which dividends shall be payable semi-annually in —— and —— in cash, as per the coupons hereto attached, and the probate thereof, if withdrawn between the semi-annual periods named; and the holder hereof specially waives all right to share in any greater rate

of dividends, or further share in the earnings of the Association.

"3. This Association reserves the right to retire and cancel this Certificate at any time after five years from the date of issuance, and the entire issue of this class of shares shall never, at any time exceed fifty per cent. of the assets of the Association.

"4. This Certificate is transferable only on the books of the Association, and is issued in pursuance of and subject to the Constitution and By-Laws of the Association, and is entitled to the protection afforded by the laws of the State of Tennessee.

"In Witness Whereof, the said American Building and Loan Association has caused its corporate seal to be hereunto affixed, and this Certificate to be signed by its President and Secretary, at the Home Office of the Association in the City of Memphis, Tennessee, this, the —— day of ——."

To this certificate are attached twenty coupons setting out that the Association "Will pay bearer Twenty-five Dollars on the —— day of ——, 19—, at the office of the Association in Memphis, Tenn., being the semi-annual Cash dividend on Ten Paid Up Shares." On the certificates, among other things, is printed: "Paid-up Shares five per cent dividends." "This Certificate is secured by First Mortgages on Real Estate."

There is nothing in this certificate indicating that it witnesses a transaction whereby the Association has undertaken the obligations of a debtor to the certificate-holder. It is a certificate in so many words that the subscriber "is a member of the American Building and Loan Association." The privilege of withdrawal on terms and conditions set forth in the by-laws on thirty days' written notice is conferred upon the holder. The

Association obligates itself not to call in the certificate for payment until after five years from date. The holder waives dividends in excess of 5% per annum. There is no undertaking on the part of the Association to pay to the holder any sum at any definite time. The privilege of withdrawal at any time is given to the holder but that withdrawal is to be on terms and conditions set forth in the by-laws and under the by-laws only one-half of the receipts from monthly dues are applicable to the discharge of withdrawal certificates.

The privilege of withdrawal upon thirty days' notice is a privilege given to installment shareholders and paid-up shareholders alike. The recital on the paid-up certificate that it is secured by first mortgages on real estate does not differentiate the paid-up certificate from the installment certificate. All the certificates are so secured. Finally, we repeat, there is nothing in the terms of the paid-up certificate of stock issued by defendant Association to give the holder of such a certificate the status of a creditor of the Association.

It is insisted on behalf of the paid-up members that the circumstances attendant upon their subscription to their shares show that the transaction was in fact a loan by them to the Association and that the certificates issued were regarded by the parties as evidences of debt. It is said that the subsequent conduct of the Association confirmed this idea.

Proof was introduced tending to show that certain officers of defendant Association represented the paid-up certificates as bonds; that a newspaper advertisement or two ran to such effect; and that the manner in which dividends on these certificates were paid and the bookkeeping entries with respect to the same—that all these

things were inconsistent with any other than the theory advanced.

Under previous decisions of this court, it would not be permissible for us to look to the representations of the Association's officers, to irregularities in the administration of the Association's affairs, or in its bookkeeping, or to newspaper advertisements as determinative of the rights of the paid-up shareholders. We have shown what the contract between these shareholders and the Association was—of what this contract consisted. The extraneous evidence offered was not effective to vary the terms of this contract. The matters so brought out are also urged as the basis of a claim for rescission of the subscribers' contracts, and to this claim for rescission we shall hereafter refer.

In support of the conclusion just stated, we may refer again to *Post* v. *Building & Loan Association, supra.* In that case the subscribers, paying in advance for their certificates of membership, had a definite agreement with the Association that "they should be treated as creditors of the association, and the amounts advanced as loans to it be repaid, with interest." The court refused to give effect to such agreement and confined the subscribers to their legal rights as members of the Association under its charter.

In *Miller* v. *Eastern Building & Loan Association*, 53 S. W. 231, this court affirmed a decree of the Court of Chancery Appeals declining to give effect to the provisions of a certificate of stock containing terms contrary to the provisions of the charter and by-laws of the Association. The ruling was that a certificate of stock itself issued by a building and loan association must be construed in connection with the by-laws and charter of the corporation and the articles of incorporation.

In *Setliff* v. *North Nashville Building & Savings Association*, 39 S. W. 546, 548, this court affirmed a decree of the Court of Chancery Appeals in which a certificate holder of the Association undertook to disavow his membership and to claim that he was a mere borrower from the Association, instead of a mere lender to the Association, as here. It was said that membership in this class of associations is acquired by the ownership of stock; that a certificate holder could not say that he "never became a 'member' of the association, in any correct sense of the term, but that he was simply a 'borrower' of money from it, and that this was known to its officers."

And again in *Province* v. *Interstate Building & Loan Association*, 104 Tenn. 458, 58 S. W. 265, this court refused to recognize, and held *ultra vires* and void, an express contract of the Association embodying an obligation beyond its charter powers.

Upon authority of the decisions just referred to, we must decline to regard representations of the Association's officers, loose bookkeeping, two newspaper advertisements, and like things, as grounds sufficient to justify claims of the paid-up subscribers that they were lenders to this Association rather than members thereof.

Closing this branch of the case we have considered *Cook* v. *Equitable B. & L. Ass'n*, 104 Ga. 814, 30 S. E. 911, and other Georgia cases following that decision, and certain additional authorities relied on by the paid-up stockholders. These authorities do support the theory that these stockholders are to be regarded in the light of creditors as against the installment stockholders.

We have heretofore commented on the fact that there was some conflict of authority. What we may call the Georgia rule seems out of line with our own decisions just mentioned. For this reason and other reasons here-

tofore detailed, we prefer to follow the contrary rule, which we believe to be the majority rule.

The paid-up stockholders place much emphasis on *Wilson* v. *Parvin,* 6 Cir., 119 F., 652, opinion by Judge LURTON. The facts of that case distinguish it plainly from the case before us. The certificates involved in that case contained a definite promise to pay a fixed sum at a fixed time and this payment was secured by a written pledge of certain of the association's mortgages deposited with a trustee. The certificate holders were allowed to collect in full out of the proceeds of the securities pledged for their benefit. Such is the extent of the decision. In the course of the opinion, the learned Judge entered into some discussion of the authority of a corporation to issue preferred stock and expressed some views about this and perhaps other matters not altogether in harmony with the views of this court. See *Born* v. *Beasley,* 145 Tenn., 64, 235 S. W., 62, and *Knoxville, G. C. & L. Railroad Co.* v. *Knoxville,* 98 Tenn., 1, 21, 37 S. W., 883. When the facts of *Wilson* v. *Parvin,* however, are considered, it is not authority for the claims of the paid-up stockholders here.

### EQUITABLE LIEN.

██ A further insistence on behalf of the paid-up stockholders is that the circumstances surrounding the issuance of these certificates, the conduct of the business of the Association, and the language of the certificates themselves, created an equitable lien upon the assets of the Association in favor of these stockholders.

The assets of the defendant Association consisted chiefly of mortgages and parcels of real estate. As before mentioned, the paid-up certificate contained a legend on the back and on the margin of the face ''Secured by

First Mortgages on Real Estate.'' As we understand the argument, it is upon these mortgages and real estate that these claimants seek to impress a lien, such being the only adequate assets of the Association.

Defendant Association owned hundreds of distinct items or articles of property. There is no attempt to fasten this asserted lien on any particular item or article or on any definite part of this mass nor is there any proof to justify such an attempt. The rule in Tennessee respecting equitable liens has been, following Mr. Pomeroy, thus stated:

''The doctrine may be stated in its most general form, that every express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund, therein described or identified, a security for a debt or other obligation, or whereby the party promises to convey or assign or transfer the property as security, creates an equitable lien upon the property [so indicated, which is enforceable against the property] in the hands, not only of the original contractor, but of his heirs, administrators, executors, voluntary assignees, and purchasers, or incumbrancers with notice.'' *Southern Ice & Coal Co.* v. *Alley,* 127 Tenn., 173, 154 S. W., 536, 538.

The foregoing has been repeated and approved in *Milam* v. *Milam,* 138 Tenn., 686, 200 S. W., 826, and *Hunt* v. *Curry,* 153 Tenn., 11, 282 S. W., 201. Generally an equitable lien is supported by an express agreement. In all instances recognized by this court the property sought to be charged has been described or identified, and there has been no lack of authority to impose the lien on the part of those who did so. In *Hurley* v. *Atchison, T. & S. F. R. Co.,* 213 U. S., 126, 29 S. Ct., 466, 53 L. Ed., 729, there

was a definite quantity of coal paid for in advance. In *United States* v. *Butterworth-Judson Corp.*, 267 U. S., 387, 45 S. Ct., 338, 69 L. Ed., 672, the fund reached was kept in a special bank account, apart from the debtor's other funds.

### WITHDRAWING MEMBERS.

Prior to July 7, 1932, defendant Association met all requests for withdrawals on demand and paid to each claimant the amount paid in by him with any dividend coming to him.

Section 3903 of the Code provides: "Any stockholder or member wishing to withdraw shall give thirty days' written notice thereof to the secretary of the company, at the expiration of which time he shall be entitled to receive the amount paid in by him."

Section 3904 of the Code provides: "At no time shall more than two-thirds of the funds in the treasury of such corporation be subject to the demands of withdrawing stockholders, without the affirmative consent of the board of directors."

By the summer of 1932 the demands for withdrawals by the stockholders of defendant Association became so heavy that it was forced to institute a withdrawal list and exact thirty days' notice. Demands for withdrawals were listed. Fifty per cent of the monthly dues paid in by installment shareholders was set aside to meet withdrawal demands and these demands were paid, in so far as funds so acquired permitted, in the order in which they were filed.

The Court of Appeals held that such of the members of the Association as had given notice of withdrawal thirty days prior to March 17, 1933, had thereby matured their stock, reached the status of creditors of the Association,

and were entitled to be paid in full out of its assets; that such of the members as had not given notice of withdrawal thirty days prior to March 17, 1933, were not entitled to preferential payment in the distribution of the Association's assets.

This date of March 17, 1933, was thus fixed because it was the effective date of Chapter 19 of the Acts of 1933. Section 7 of that Act contained, among other things, this provision:

". . . Any shareholder or member wishing to withdraw shall give thirty days written notice thereof to the Secretary of the Association, at the expiration of which time he shall be entitled to receive the amount paid in on account of the purchase price of his shares from funds available to the demands of withdrawing shareholders at the times and in the manner prescribed by the by-laws of the Association; . . . that at no time shall more than two-thirds of the monthly receipts from dues for the prior month in the Treasury of the Association be subject to the demands of the withdrawing shareholder without the affirmative action and consent of the Board of Directors."

By-laws of the Association contained these provisions:

"Thirty days' notice of withdrawal must in every case be given in writing to the home office in Memphis, Tenn.

"Applications for withdrawals shall be filed in the order in which they are received and paid in the order in which they are filed, as fast as one-half of the receipts from monthly dues on shares secured by real estate will permit; provided that the directors may apply as much more of the receipts to the payment of withdrawals as they may deem advisable for the best interest of the Association."

Under the provisions of the Act of 1933 and the by-laws

just quoted, after seasonable notice of withdrawal, a member of defendant Association is entitled to payment when an adequate fund arises from one-half of the monthly dues. No such fund for the payment of the claims of the withdrawing stockholders here involved ever arose. Under this statute their right to payment was restricted to a designated fund.

If the Act of 1933 applies to stockholders who had given notice of withdrawal previous to its enactment, these earlier withdrawal claimants would be no more entitled to preferential payment than those giving notice subsequent to the effective date of the Act. The Court of Appeals, with some apparent reluctance, felt constrained by the authority of *Lunati* v. *Progressive Building & Loan Association,* 167 Tenn., 161, 67 S. W. (2d), 148, 150, to hold that the Act of 1933 did not affect those members serving withdrawal notices before its passage in so far as the right of those members to obtain payment for their stock was concerned. The court thought that under the *Lunati Case* such stockholders by the service of notices of withdrawal became creditors of the Association entitled, after thirty days, to sue for their claims and to have judgment and execution. Counsel for the receiver challenges the construction of the *Lunati Case* which was placed upon it by the Court of Appeals, and indeed the matter presented in that case called for no such decision. The question for decision was whether the Commissioner of Insurance and Banking had an exclusive right to file a receivership bill against a building and loan association, or whether such a bill might be maintained by stockholders. In the course of the opinion in the *Lunati Case,* speaking of stockholders who had served notice of their intention to withdraw, it was said:

"They had perfected their right as withdrawing mem-

bers by notice as provided [by] statute, and when that was done they became creditors of the association to the amount due them as withdrawing shareholders. In the absence of a forbidding statute or by-law, and there is none, complainants can enforce their right as creditors by action pursued to judgment and execution.''

Judge Cook was here speaking of the rights of withdrawing members of a going concern. The application for a receiver had been denied.

In *Post* v. *Building & Loan Association, supra,* this court apparently approved a statement of the Court of Chancery Appeals that the position of members holding stock in a series declared matured by mistake, when in point of fact it had not matured, is, ''in respect to the assets of the insolvent corporation, the same, in effect and as to results, as that of members giving notice. They are not entitled to be paid in preference to other stockholders. They will prorate with all other stockholders in the assets of the association after the expenses of the administration of its affairs are paid.'' The Court of Chancery Appeals found that the stock had not reached its full maturity value of $1,000 but that its value was $792.82. This court, treating this member as a withdrawing stockholder, made him share ratably with other stockholders in the distribution of assets.

Neither of these two cases noticed Section 3904 of the Code, heretofore set out, providing that not more than two-thirds of the funds in the treasury of a building and loan association should be subject to demands of withdrawing stockholders.

The Court of Appeals in *Dwyer* v. *Progressive Building & Loan Association,* 20 Tenn. App., 16, 94 S. W. (2d), 725, 728, did comment on this section and contrasted it with Section 3899 of the Code, providing that: ''The

personal representative, upon the death of a stockholder, shall be entitled to receive the full amount paid in by the deceased, and any profits which have been realized."

Following Chancellor DeHaven to whose observations it referred, the Court of Appeals said that without the restriction on the right of withdrawal contained in Section 3904 it would be within the power of a group of stockholders to wreck the association by making unexpected demands on it for payment; that in seasons of financial depression, the need of the members for money would result in unusual demands which would wreck an association in the absence of such limitation. The court then said:

"It was, no doubt, the intention of the Legislature that such condition could be anticipated and prevented by the very wise provision with reference to the filing of 30 days' notice for members desiring to withdraw, and that payment would be made to such withdrawing members in the order in which their applications were filed; and, further, that only two-thirds of the dues paid in would be subject to the withdrawals, and the other one-third to remain in the treasury of the association to protect it against such a contingency or happening. On the other hand, the same conditions could not be reasonably anticipated in the deaths of members, since it could not be reasonably anticipated that deaths of members would occur with such frequency as to financially embarrass the association in settling the amount due to a deceased member promptly upon the death of such deceased member."

It appears from the opinion in the *Lunati Case* that the defendant association there had on hand $29,908.75 cash. The demands of the withdrawing stockholders bringing the suit amounted to $1,690.94. So far as Sec.

3904 was concerned, there was no reason why these stockholders could not have judgment and execution. It was noted in the opinion that there was neither forbidding by-law nor statute. This court, therefore, has never held that a withdrawing stockholder after notice might have judgment and execution regardless of the amount of funds in the treasury of the association. On the contrary, the right to satisfaction of withdrawal claims has always been limited by Sec. 3904 of the Code. The Act of 1933 merely imposed a further limitation upon this right.

We may concede that the *Lunati Case* is authority for the proposition that a statute could not be constitutionally enacted which would affect the withdrawal rights of those who demanded payment prior to the enactment of such statute. The latter conclusion finds justification in previous decisions of this court and the Supreme Court of the United States, although the circumstances under which those earlier cases arose were different from those in the case before us.

Building and loan associations have been regulated by different statutes of this State since their organization. These statutes are referred to in *Lunati* v. *Building & Loan Association, supra,* and it is said in that case that such institutions "are the peculiar objects of public interest and necessary subjects of supervision by the State and properly invite the enactment and application of regulatory statutes like the Act of 1933."

This court, as everyone else does, knows that the Act of 1933 was enacted (March, 1933) at the depth of the financial depression. At that time there were many building and loan associations organized under the laws of this State and operating in its boundaries. These associations had thousands of loans secured by mortgages on real estate. Institutions of this character were located

in most of the county seats of the State, more than one in some of the larger cities of the State. They had thousands of members, many of them wage earners, the greater part of whose savings was invested in stock of these associations. Many people of limited means had invested in the paid-up stock of such associations as had people of larger means. The record in this case shows the tremendous demand made upon defendant association by its stockholders for withdrawals, the financial stringency of the times forcing these stockholders to obtain ready money from every possible source. Without some check upon such withdrawals, all these associations faced ruin and forced liquidation. Such result would have been disastrous to the welfare of the State and would have affected other business and financial interests to a great extent.

From an examination of the Act, we think there is no doubt but that it was designed to regulate the withdrawal rights of all members of building and loan associations, whether they became members before or after its passage or whether their notices of withdrawal were served before or after the passage of the Act.

The Act is entitled ''An Act to define and further provide for the incorporation, supervision, regulation, examination, liquidation and control of building and loan associations; and, to further define their powers and methods of doing business to further safeguard investments therein;'' etc. The first section of the Act provides: ''That a Building and Loan Association, as contemplated by this Act, is any association or corporation heretofore or hereafter formed, created or organized which is chartered under any Building and Loan law to carry on the business of a Building and Loan Association.''

That portion of section 7 of the Act heretofore quoted provides that ''Any shareholder or member'' wishing to withdraw shall give the notice and be entitled to receive the amount paid in by him, provided that at no time shall more than two-thirds of the monthly receipts from dues for the prior month in the treasury of the association be subject to the demands of the withdrawing shareholder, etc. The mischief wrought by unrestricted payment of the demands of one class of stockholders would have been as great as that caused by such meeting of the demands of the other class.

Under circumstances existing in New Jersey in 1932, similar to those existing here, the Legislature of that State enacted a law which materially restricted the rights of members of a building and loan association with reference to withdrawals. N. J. S. A. 17: 12-49, 17: 12-53. It was contended that this Act.was unconstitutional as in violation of Section 10 of Article 1 of the Federal Constitution and the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the Federal Constitution. A case presenting these contentions reached the Supreme Court of the United States. *Veix* v. *Sixth Ward Building & Loan Association of Newark*, 310 U. S. 32, 60 S. Ct., 792, 794, 84 L. Ed. 1061.

The Court in the *Veix Case*, among other things, said:

''With institutions of such importance to its economy, the State retains police powers adequate to authorize the enactment of statutes regulating the withdrawal of shares. Unquestionably for the future, the provisions of the 1932 Act would be effective. We think they were equally effective as to shares bought prior to the enactment of the statute, notwithstanding the provisions of Article I, Section 10 of the Constitution that 'No State shall . . . pass any . . . Law impairing the Ob-

ligation of Contracts . . .' This is so because the obligation of the Association to respond to the application for withdrawal was subject to the paramount police power."

It was held in this case that one who purchases into an enterprise already regulated by statute purchases subject to further legislation upon the same topic.

Further in its discussion the Court said:

"When the 1932 Act was passed commercial and savings banks, insurance companies and building and loan associations were suffering heavy withdrawals. The liquid portion of their assets were being rapidly drained off by their customers, leaving the long term investments and depreciated assets as an inadequate source for payment of the remaining liabilities. An acceleration or a continuance of this tendency to withdraw available funds threatened a quick end to the ability of the institutions to meet even normal demands. Such threatened insolvency demands legislation for its control in the same way that liquidation after insolvency does. Such legislation may be classed as emergency in one sense but it need not be temporary."

Distinguishing the case of *Treigle* v. *Acme Homestead Association,* 297 U. S., 189, 56 S. Ct., 408, 80 L. Ed., 575, 101 A. L. R., 1284, relied on by the withdrawing stockholders here the Court did in the *Veix Case* note that the statute considered in the *Treigle Case* was enacted after notices of withdrawal had been served by the stockholders involved. This, however, was not the ground upon which the two cases were differentiated. It was said:

"From all the circumstances of the Louisiana building and loan situation at the time of the legislation attacked in the *Treigle Case* this Court reached the factual conclusion that the withdrawal amendment to the building

and loan statutes was directed merely toward a private right and not deemed in the public interest.''

We are not able to see that a statute which limits the right of a member of a building and loan association to be paid the value of his shares is more open to objection when it is enacted after the intention to secure such a right is disclosed than if enacted before such intention is disclosed. The constitution protects contract obligations before as well as after maturity. In either case the contract precedes the statute.

The Legislature of 1933 recognized the depressed financial condition of the community in many ways. A number of laws were passed at this session seeking to ameliorate conditions. In addition to chapter 19 of the Acts of 1933 respecting building and loan associations, there was chapter 107, providing for the reorganization of State banking institutions; chapter 144, authorizing the appointment of conservators for State banks; chapter 30, authorizing insurance companies to limit grants of loans or cash value on life insurance policies; and several acts deferring the time for collection of taxes and others authorizing the proclamation of business holidays by the Governor. Most of these acts contain provisions which formerly would have been held to violate constitutional provisions.

Construing chapter 107 of the Acts of 1933, regulating the reorganization of State banking institutions, we said:

''Inasmuch as the Supreme Court of the United States is the final arbiter of questions involving the contract, retrospective law, due process, and equal protection provisions contained in both State and Federal Constitutions, we must regard the decision [of that court] in *Doty* v. *Love* [295 U. S., 64, 55 S. Ct., 558, 79 L. Ed., 1303, 96 A. L. R., 1438], *supra,* as conclusive upon such points made

in this case." *Paine* v. *Fox,* 172 Tenn., 290, 112 S. W. (2d), 1, 4.

Our attitude necessarily remains the same. So without further elaboration, upon the authority of the *Veix Case, supra,* we hold that the provisions of section 7 of chapter 19 of the Acts of 1933 with reference to withdrawals were applicable equally to those who served notices of withdrawals prior to the enactment of that statute and to those who served such notices after its enactment.

There is some conflict of authority, in cases where payment of withdrawing members is limited to a designated fund, as to whether such members are entitled to judgment and execution against the association when the fund is insufficient to pay them, the association being a going concern. *United States Building & Loan Association* v. *Silverman,* 85 Pa., 394, cited in the *Lunati Case,* held that they were, but execution was suspended for a reasonable time to permit the fund to accumulate.

Likewise, while again there is some conflict, we think the decided weight of American decisions is that withdrawing members will not be paid the withdrawal value of their shares, where payment is limited to a designated fund, unless there is in existence, after notice of withdrawal, at or before insolvency a sufficient accumulation in the designated fund for satisfaction of such claims. In circumstances like these, no preference in distribution is made to withdrawing members, insolvency having intervened before payment. We may refer to *Fitzgerald* v. *State Mutual Building & Loan Association,* 76 N. J. Eq., 137, 79 A., 454, 139 Am. St. Rep. 743; *Rabitt* v. *Wilcoxen,* 103 Iowa 35, 72 N. W., 306, 38 L. R. A., 183, 64 Am. St. Rep. 152; *Miers* v. *Columbia Mutual Building & Loan Association, C. C.,* 157 F. 940; *Reddick* v. *United States Building & Loan Association's Assignee,* 106 Ky.,

94, 49 S. W., 1075, and other cases collected in a note, 98 A. L. R., 118. This, indeed, was the effect of the ruling in *Post* v. *Building & Loan Association, supra*. The member's stock had been mistakenly declared matured before insolvency. The court said that he occupied the position of a withdrawing stockholder—withdrawing before insolvency. The member, however, was not allowed any preference in the distribution of assets.

It has often been noted that the right of a stockholder to withdraw and receive the value of his stock is peculiar to building and loan corporations. A stockholder of no other corporation has any such right. The right is conferred by statute (Code, Sec. 3903) and it is limited by statute (Code, Sec. 3904) and chapter 19, Acts of 1933.

The right conferred by section 3903 being thus limited a withdrawing member, while sometimes referred to as a creditor, does not have a legally enforceable right to payment for his shares until the appointed fund is adequate. Such a right, legally enforceable, does not accrue until there are available funds applicable under the statute.

The defendant Association here was delinquent three years and five months in paying withdrawal demands at the time of insolvency. At no time after the withdrawing stockholders gave notice were there on hand available funds to pay their claims. In view of the provisions of Code, Sec. 3904, and the view of that section taken by this court the last time the matter was before us, on petition for *certiorari* in *Dwyer* v. *Progressive Building and Loan Association, supra,* these withdrawal claimants would not have been entitled to judgment and execution against the Association prior to insolvency. With entire deference to courts taking a contrary view, we are unable to see

how insolvency could enhance the rights of such withdrawing stockholders.

If it be said that our statute restricting the right of withdrawal is applicable only to going concerns, then after insolvency no right of withdrawal can exist, for, as before seen, the right of withdrawal is purely statutory. The withdrawing members are not the owners of preferred stock and, no statute being applicable, have no superior claims over other stockholders in the distribution of the assets of the insolvent corporation.

We are not unmindful of the decision in *Cohen* v. *Swink,* 173 Va. 64, 3 S. E. (2d), 471, relied on by the claimants. This case may, perhaps, be distinguished on its fa ts, but if not, with entire respect, we are not willing to follow it. The same may be said of *In re Harr*, 129 Pa. Super., 249, 195 A. 766, 770. *Cohen* v. *Swink* is certainly out of line with the *Veix Case* heretofore discussed.

For convenience we have heretofore discussed assignments of error filed by the receiver and assignments of error filed by claimants asserting preference, together. Continuing we will next dispose of questions raised by the receiver's assignments of error.

### The Burdick Claim.

A. W. Burdick died in September, 1921, leaving an estate of approximately $65,000, $22,000 in paid-up shares of defendant Association. By will he left his entire estate to his wife and three children equally. His wife, Mrs. Sophia Burdick, qualified as executrix of his estate and the building and loan shares were transferred to her name as executrix in November, 1921.

By agreement with their mother, the three children each took $5,000 from the estate, leaving the balance in the hands of their mother. It was agreed that she should

have the income from that portion of the estate left in her hands during her life. It was supposed that the income would be sufficient for her needs. Several years thereafter, the income from the estate proving inadequate, the children agreed that their mother might use the corpus of the estate. She did, as we understand the record, trench on the corpus from time to time as she saw fit during her lifetime.

In 1931 the shares of stock owned by A. W. Burdick matured and the widow purchased other like shares of defendant Association in the same amount, taking title in her own name. These shares were registered on the books of the Association in the name of Mrs. Sophia Burdick individually. Mrs. Burdick died March 4, 1936, prior to the date fixed by the court below (April 1, 1936) as the date of the insolvency of defendant Association.

After the death of Mrs. Burdick, her three children filed a petition in the probate court of Shelby County alleging that under the arrangement with their mother heretofore mentioned, she held these shares in trust to have the benefit of them during her lifetime, the shares to pass to the three children at her death. This was an *ex parte* proceeding in the probate court *in re* their father's estate. There was no representation of Mrs. Burdick's estate. The probate judge made a decree in accordance with the claims of the children to the effect that the shares belonged to the children, not to the estate of Mrs. Burdick.

The children made demand upon the Association for payment of these shares which was declined on the ground that the shares belonged to their mother and payment could only be made to an accredited representative of the mother's estate.

Later A. W. Burdick, Jr., one of the Burdick children, qualified as executor of Mrs. Burdick's estate and

brought the suit herein, as her personal representative, to enforce payment of these shares by defendant Association according to the provisions of the statute. The chancellor sustained this claim and his decree was affirmed by the Court of Appeals. Of this action the receiver complains.

The receiver resists this claim on the sole ground that A. W. Burdick, Jr., and the other Burdick children, in view of the allegations of the petition filed by them in the probate court, are judicially estopped from claiming that the shares of stock belonged to their mother and passed under her will. It should have been stated that Mrs. Burdick by her will left all the property to her three children equally.

While these parties did allege under oath in the proceedings in the probate court that they were the owners of these shares, the courts below were of the opinion that this was merely an allegation of a conclusion of law not binding on the petitioners under repeated decisions of this court. *Tate* v. *Tate,* 126 Tenn., 169, 148 S. W., 1042, and cases therein cited. We think this was right.

So far as the facts concerning the later agreement between Mrs. Burdick and her children are developed, it seems to us that they gave to her full power of disposition of that portion of the estate left in her hands. No limitation on her power of disposition is apparent. As indicating the extent of her power, when the old certificates matured, with the acquiescence of her children, she took out new shares in her individual name. Such power over the estate was inconsistent with the limitations over or any trust in favor of the children. *Meacham* v. *Graham,* 98 Tenn., 190, 39 S. W. 12, and cases cited. The chancellor and the Court of Appeals properly held that the shares of stock were the property of Mrs.

Burdick at her death and that her personal representative was entitled to collect their value.

There was no dispute about the facts respecting the two agreements concerning these shares. The Burdick children made no misrepresentation of fact in their petition filed in the probate court. That petition disclosed merely an erroneous view of the law.

It follows that the assignment of the receiver respecting the allowance of the Burdick claim is overruled.

## The Steuterman Claim.

One Frank Steuterman died on July 4, 1933. At this time seventy shares of Class A stock stood on the books of the company as the property of "Frank J. Steuterman or Mrs. Theresa Steuterman." On November 30, 1932, several months before his death, Frank J. Steuterman wrote to the Association requesting the payment of the withdrawal value of these shares. Mrs. Steuterman knew of this action by her husband and agreed to it. The letter was accepted by the Association as a withdrawal notice and the shares placed on the withdrawal list as No. 284. Before this number was reached in the settlement of withdrawals, Steuterman died as aforesaid. Mrs. Steuterman qualified as his executrix and demanded payment of the value of the certificates and was told by the president of the Association that the claims would be paid as soon as reached on the withdrawal list and they were regarded as death claims by the Association and were to be paid as such.

The payment of this claim is resisted by the receiver on the ground that Steuterman and his wife held these shares of stock as tenants by the entirety; that upon his death they became the property of Mrs. Steuterman as survivor, and that as representative of his estate Mrs.

Steuterman has no standing to demand payment of the value of the certificates as a death claim.

Counsel for Mrs. Steuterman, the executrix, sharply challenge the proposition that Steuterman and his wife owned these shares as tenants by the entirety. For present purposes only, we may admit that they did have such an estate in the stock. Nevertheless, according to the record, Mrs. Steuterman knew of her husband's demand that the value of the certificates be paid to him and agreed that this might be done. As an emancipated married woman, owning her property as a *feme sole,* she had a perfect right to surrender her interest in these shares to her husband, and to authorize him to collect them on his own account. By so doing, she relinquished her interest in the property, the claim against the Association for payment became his, and the right of his estate to payment was matured by his death.

It follows that the assignment of error of the receiver as to the allowance of the Steuterman claim is overruled.

### RECEIVER'S NINTH ASSIGNMENT OF ERROR.

This assignment relates to the form of the decree of the Court of Appeals. This matter will be considered when the decree of this court is drafted.

### THE SHEELY CLAIM.

At the death of Edward V. Sheely, his widow, Mrs. Ruth A. Sheely, learned for the first time that on July 1, 1926, Mr. Sheely had bought fifty shares of Class A stock issued in the names of "Edward V. Sheely or Ruth A. Sheely."

On January 8, 1934, Mr. Sheely filed a withdrawal notice, which the Association acknowledged, advising that his demand had been filed and that he would be notified when the withdrawal was payable. Mr. Sheely died on

August 21, 1935, before his demand for withdrawal had been paid. By his will he left all his estate to his wife. Mrs. Sheely qualified as executrix of this will, claimed the building and loan stock under her husband's will, listed it as part of her husband's estate, and paid inheritance tax on it. She thereafter demanded payment of this stock by the Association as a death claim under Code, Sec. 3899, hereinbefore set out.

The Association resisted this demand on the theory that Mr. Sheely and his wife held these shares as tenants by the entirety, that she took them as her own by survivorship, and was not entitled to make claim for the value of the shares as executrix of her husband's estate. The chancellor sustained her contention but the Court of Appeals disagreed with him.

We prefer the view of the chancellor. Mrs. Sheely knew nothing of the purchase of these shares by her husband. Ordinarily acceptance in a case like this might be presumed. Any acceptance of an interest in these shares, except as her husband's executrix, was repudiated. As soon as she learned of the purchase by her husband of the shares, of the issuance of the shares in the two names, she disclaimed her interest by returning the shares as part of her husband's estate and paying the inheritance tax based upon the value of the same.

While the election to take as executrix might not have been binding on her, if she had sought to escape it, she has persisted in this election and we think the Association has no standing to complain of her course.

The decree of the Court of Appeals as to Mrs. Sheely will accordingly be modified and the decree of the chancellor affirmed.

## Rescission Claims.

These claimants are Bacigalupo, Fritchey, Mrs. Bates, and Epstein. They are all the holders of paid-up stock in the Association. After the receivership, they filed petitions asserting the right to preferential payment of their shares based on grounds similar to the grounds urged in behalf of other paid-up shareholders whose claims have been heretofore discussed. Later, with permission of the chancellor, these petitions were amended setting out that petitioners were induced to buy these shares upon misrepresentations of officers of the Association, and if not entitled to preferential distribution on other grounds, they ask for rescission of their contracts and for the return of the respective sums paid by them for their shares. The chancellor and the Court of Appeals denied these claims.

The proof offered by these claimants has been hitherto referred to. It consisted of their testimony as to the confidence that they had in officers of the defendant Association; that their purchases of the paid-up stock were made upon the advice of these officers; that the Association was represented to them as amply solvent, and that the paid-up certificates would be paid on demand. That the paid-up certificates were as good as gold and were secured by first mortgages on high-class Memphis real estate. That the certificates were referred to in these negotiations as "bonds" or "gold bonds" and that it was represented that they were guaranteed by all the assets of the Association and ahead of installment shareholders. Such is the substance of this proof. The chancellor thought there were several reasons requiring that he should deny rescission. The Court of Appeals denied rescission largely on the ground of laches of the peti-

tioners in asserting their claims. Without questioning the reasons upon which the other courts acted, we desire to affirm their action upon the basic ground that the evidence offered by petitioners does not establish any misrepresentation of fact by the officers of defendant Association. The only statements of fact by these officers were that the paid-up certificates were paid on demand and that the Association was solvent. These statements were true at the time the shares were purchased.

The statements that the certificates were secured by first mortgages on real estate was likewise true. The statement that the certificates were as good as gold was clearly a matter of opinion.

The other statements to the effect that the certificates were *bonds* or *gold bonds* and that, in respect of the assets of the Association, they came ahead of the installment certificates, were statements of law rather than of fact.

There is no showing that the officers of the Association had a fraudulent intent in making statements that the certificates were bonds and constituted prior claims on the Association's assets. The officers doubtless entertained this opinion. Several able lawyers entertained a like opinion, have urged it upon the court, and perhaps will persist in this opinion notwithstanding our decision herein.

To describe these paid-up certificates as bonds and as prior charges on the assets of the Association was a mistake. It was not, however, a mistake of fact. The certificates were open to the inspection of the purchasers as were the by-laws of the Association and the statutes regulating the Association. The mistake was as to the legal effect of the certificates which the petitioners bought. Rescission does not lie under such circumstances.

 Expressions of opinion, not statements of existing facts, although such opinions are erroneous, are insufficient for the purpose of rescinding a contract at law or in equity. *Madison Trust Co.* v. *Stahlman,* 134 Tenn., 402, 183 S. W., 1012; *Maney* v. *Porter,* 22 Tenn. (3 Humph.), 347.

 The officers merely announced a mistaken view of the law—their opinion, and a mistake of law does not affect the enforceability of an agreement. "A mistake of law is where a person knows the facts of a case but is ignorant of the legal consequences." 13 C. J., 379; 17 C. J. S., Contracts, Sec. 144. In *Farnsworth* v. *Dinsmore,* 32 Tenn. (2 Swan), 38, referring to a mistaken view of the law held by one of the parties to an agreement, the court said that such mistake was no objection to the validity of the agreement. "For, it must now be taken as a settled principle that an ignorance of the law, and a consequent mistake as to the title founded upon such ignorance, is no ground to rescind agreements, or to set aside the solemn acts of the parties." Citing *Trigg* v. *Read,* 24 Tenn. (5 Humph.), 529, 535, 42 Am. Dec., 447.

"Where there is no fraud or mistake in matter of fact, if the law was mistaken, the rule applies, that *ignorantia juris non excusat.*" *Mowatt* v. *Wright,* 1 Wend. (N. Y.), 355, 19 Am. Dec., 508.

"But that is merely saying that he did not fully understand the legal effect of his contract, which would not justify a court in setting it aside." *Carter* v. *Love,* 206 Ill., 310, 69 N. E., 85, 87.

It is contended in behalf of Epstein that his case differs from the others seeking rescission, in that he purchased his shares in 1932 and that the Association was not then paying withdrawal demands on presentation. It is accordingly said that a statement made to him that the

Association was so paying withdrawal demands was a misstatement of fact. Neither the petition for *certiorari* nor the brief refers us to any portion of the record where the evidence relied on is contained. An erroneous citation is given to some testimony of Bacigalupo, no reference to pages of the record where Epstein's testimony may be found.

Rule 14 (2) of this court, 173 Tenn., 874, specifically requires an assignment of error with reference to the facts of the case to refer "to the pages of the record where the testimony is to be found relied upon to sustain the same." The record before us is enormous and this is quite a proper case for the enforcement of this Rule.

Furthermore, the master in his report considered Epstein's testimony carefully and concluded that it was not clear and cogent enough to support a claim for rescission.

As heretofore noted, the chancellor and the Court of Appeals found several other good reasons for denying the relief of rescission to these petitioners. Several of these reasons are no doubt good, but discussion is not required.

## The Weiss Claim.

Max Weiss, as executor of the will of his wife, Mrs. Minnie Weiss, seeks payment as a death claim of certain shares of installment stock belonging to the decedent. The facts are these:

Mrs. Weiss, to whom these shares were issued, died on September 29, 1931. She left a will, exhibited with the record, under which her husband was the residuary legatee and executor. On October 27, 1931, about a month after the death of Mrs. Weiss, her shares of stock were transferred to this petitioner as executor and he paid dues

on said shares for a number of years, and the shares were credited with dividends.

Petitioner seems to have disposed of some of the shares of stock and only twenty shares are involved in this litigation. Mrs. Weiss made bequests of $1,000 each in favor of two relatives. In 1933 Weiss transferred to a trustee for these beneficiaries twenty shares of stock, ten shares for each of the legatees. Weiss testifies that the shares of stock were accepted by the trustee for the beneficiaries upon the understanding that they would be later taken up in cash when the stock matured.

In 1938, after the insolvency of the defendant Association, Weiss took up these shares from the trustee aforesaid, and now claims to hold them as executor of his wife's will, and to be entitled to the benefits of section 3899 of the Code, hereinbefore set out.

Upon the facts detailed, the conduct of Weiss seems incompatible with his present theory that as executor of his wife's will he demanded payment of these shares on her death. The shares were transferred to him as executor, he paid dues on them, received credit for dividends on them, settled legacies with them (at least tentatively), and no demand for payment was made under section 3899 until nearly seven years after the death of his wife.

The petitioner seeks to escape the effect of his conduct by saying that he was ignorant of his rights under section 3899 and that he was mislead by an officer of the Association. We find nothing in his petition nor in his testimony indicating any fraudulent conduct on the part of any officer of the Association nor any breach of duty toward Weiss. Neither the Association nor its officers stood in any fiduciary relation to Weiss. His petition states that upon his wife's death he took his shares to officers of the Association and asked what he should do

and "that the said officers advised your petitioner to transfer the stock to his name as executor and withheld from him the fact, as hereinafter alleged, that the stock had matured as an asset of the deceased's estate and as a debt owing by the Association and did not advise him that he was entitled to collect the full sum represented thereby."

According to this statement, Weiss merely asked for advice and the officers of the Association no doubt gave him the benefit of their best judgment. That was in 1931 when the Association was prospering and the investment appeared good. The petition wholly fails to aver any demand and refusal to pay.

The testimony of Weiss does not make his case any stronger than his petition. He does state that he applied for a loan upon his shares some time later and was told that he could only have $300. This, however, was some two years after the stock had been transferred to him as executor, and even then Weiss does not in his testimony make out a demand for payment. There is nothing in his testimony or conduct up to that time indicating that he wished to part with his shares.

It is argued that an executor has no right to take out new shares in a building and loan association in the place of shares formerly belonging to a decedent. That it is the duty of an executor to realize upon said shares. As the Court of Appeals, however, observed, if there was a breach of duty on the part of Weiss, it was his own wrong and he cannot be heard to complain of it. It does not appear that any beneficiary under the will of Mrs. Weiss is complaining and the will shows that Weiss is the residuary legatee.

It may be said that Weiss appears to have been advised by capable counsel for some years, but made no demand

for payment of these shares until 1938, nearly two years after the date fixed as the date of insolvency of defendant Association.

The Court of Appeals has considered this claim more in detail, and we concur with that court in the conclusion that there is no merit in the claim under the circumstances appearing.

THE RAPP CLAIM.

This claim was filed by Edward D. Rapp as executor of Mrs. Annie G. Rapp and is pressed on the court as one entitled to preferential payment under the death statute, section 3899 of the Code.

The testatrix died July 28, 1936. The lower courts fixed the date of insolvency of defendant Association as April 1, 1936. Both courts accordingly ruled that the provisions of section 3899 were not applicable. The petitioner challenges both the premise and the conclusion involved in this ruling.

The master and the chancellor fixed the date of insolvency as of April 1, 1936. The insolvency of the Building and Loan Association is a question of fact (9 C. J. 991; 12 C. J. S., Building and Loan Associations, Section 110), and if there is evidence to sustain the concurrent finding of the master and chancellor it was binding on the Court of Appeals and is binding on this court.

In *Johnston* v. *Grosvenor*, 105 Tenn., 353, 363, 59 S. W., 1028, 1031, this court approved the statement that the insolvency of a building and loan association "is that condition of its affairs in which it is unable to pay back to its members the amounts paid in by them respectively, dollar for dollar." Such is the general rule.

"The insolvency of a building and loan association is *sui generis*. It is such a condition as reduces the avail-

able and collectable assets below the level of the stock already paid in, and makes it impossible for the association to pay back to its stockholders the amount of their contributions. However, it does not consist in the inability to pay its available debts but merely in the inability to satisfy the demands of its own members. Such inability must result from losses in the capital paid in by the members. The question then is presented as to the result upon the rights and liabilities of the members or stockholders of such insolvency, involving, as it necessarily does, an abandonment of the scheme of the corporate enterprise under which, usually, the loans have been made payable at a period when, according to the expectation of the members, the stock pledged would be equivalent in value to the amount of the loan, and thus the obligation would be canceled without any direct payment of money." 9 Am. Jur., 174.

■ "A building and loan association is considered insolvent, in the sense that the appointment of a receiver is justifiable, when its financial condition is such that it is unable to fulfill the purpose of its creation; and more particularly, it is held that the association is insolvent when it cannot pay back to its stockholders the amount of their contributions, dollar for dollar; but in some jurisdictions this test has been held not applicable." 12 C. J. S., Building and Loan Associations, Sec. 110, p. 529.

■ The defendant Association, in our opinion, was insolvent in the sense of these authorities much earlier than April 1, 1936. No other petitioner herein complains that the lower court fixed the date of insolvency too early. Clearly it seems to us actual insolvency of defendant Association preceded the death of the testatrix on July 28, 1936.

The Department of Insurance made a careful and com-

plete audit of the affairs of the Association in the summer of 1936 and the report filed by the examiner of that Department as of August 31, 1936, showed that there was a deficit or capital impairment of $730,067.75. The master said in his report that he was "of the opinion that the Examiner's figures very closely reflected the real condition of the American Building and Loan Association, as of August 31, 1936, and it is evident from the said report that the Building and Loan Association had suffered actual capital impairment at some date much earlier than April 1, 1936, and in fact was probably insolvent in the sense that its capital was impaired on the date of the previous annual Examiner's report, to-wit, August 31, 1935."

Defendant Association could not, therefore, have been solvent on July 28, 1936, when, about a month later, the figures showed that its surplus had all been wiped out and there was a capital deficit of over $700,000.

While as seen from the authorities quoted a test of insolvency is applied to building and loan corporations different from the test applicable to ordinary business corporations, under the latter test, we think the proceedings of the officers and directors of this Association, immediately before and immediately after April 1, 1936, amounted to an overt act of insolvency as of that date. The board of directors had several meetings during the month of March, 1936, when the affairs of the Corporation were very gravely considered. It is not necessary to go into the details of all these meetings. On April 2 the board of directors passed a resolution "that the President and all officers be requested and they are now requested neither through themselves nor through others to pay out any sums other than those necessary in the usual conduct of the business and maintenance of the

office of the Association except upon the express approval in writing of the majority of the Board of Directors in regular meeting assembled."

After the adoption of this resolution no other maturities of any sort were paid. No stock had been sold since the latter part of February preceding. At a meeting of the board of directors on April 8, 1936, a resolution was adopted directing the opening of a new bank account and the deposit in that bank account of "all dues paid on investments and loan shares received after March 31, 1936, and all future dues payments as made until instructed otherwise by the Board."

Thereafter all dues paid in were kept in this separate bank account, and after the receiver herein was appointed this money was returned to the stockholders making the payments.

Under the statutes heretofore set out, it is the duty of a building and loan association to meet death claims upon presentation and to maintain a fund to meet the maturities of the shares issued. The latter fund is built up from dues as previously appears.

Now when defendant Association, already more than three years delinquent in paying withdrawal claims, through its directors abandoned all effort to keep up the fund applicable to such claims, and directed dues received to be put in a separate bank account, we think this was an abandonment of the scheme of the corporate enterprise. If an ordinary business corporation, by resolution of its board of directors, should stop paying its creditors, and deposit all its funds applicable to creditors in a special bank account, this would be an overt act of insolvency. Members of this Association, whose shares had matured, while not strictly speaking creditors, were at least en-

titled to have the fund provided by law for their benefit kept up.

· We agree, therefore, with the conclusion of the lower courts that April 1, 1936, may very well be fixed as the date of the insolvency of defendant Association, if an overt act were required for that purpose.

Moreover, we agree with the Court of Appeals that further acts of the Association transpiring in July, 1936, prior to the death of petitioner's testatrix, were overt acts of insolvency.

Two resolutions were passed at this meeting of the stockholders on July 21, 1936. One of these resolutions authorized the directors of defendant Association to turn over to a federal association to be organized such of defendants assets as were acceptable to the new corporation. The other resolution authorized the directors to liquidate the remaining assets of the defendant.

Under the first resolution stock of the federal association was to be received in payment for the assets of defendant and this new stock distributed among defendant's shareholders according to the interests of the latter. Under the second resolution, the remaining assets of defendant were to be controverted into cash and the proceeds distributed among defendant's shareholders according to their respective interests.

These two resolutions, therefore, provided for the disposition of all the assets of the defendant. We do not see how it is possible to say that defendant Association was a going concern after these proceedings had on July 21, 1936, and petitioner's testatrix did not die until July 28, 1936.

Petitioner points to various acts of defendant Association, directors' meetings, and other things as tending to

show that the Association continued to function after July 21, 1936, and was still a going concern.

We think the things relied on were all acts performed in the course of liquidation and not things done in the pursuit of the activities for which the Association was chartered.

The Supreme Court of Alabama, in *Corey* v. *Wadsworth*, 99 Ala., 68, 11 So., 350, 353, 23 L. R. A. 618, 42 Am. St. Rep. 29, expressed itself thus:

"At what stage of a corporation's affairs must it be pronounced insolvent, so as to bring it within the principle we have declared? It is not enough that its assets are insufficient to meet all its liabilities if it be still prosecuting its line of business, with the prospect and expectation of continuing to do so.; in other words, if it be, in good faith, what is sometimes called a 'going' business or establishment. Many successful corporate enterprises, it is believed, have passed through crises, when their property and effects, if brought to present sale, would not have discharged all their liabilities in full. We feel safe in declaring that when a corporation's assets are insufficient for the payment of its debts, and it has ceased to do business, or has taken, or is in the act of taking, a step which will practically incapacitate it for conducting the corporate enterprise with reasonable prospect of success, or its embarrassments are such that early suspension and failure must ensue, then such corporation must be pronounced insolvent."

Our own cases, referred to by petitioner, are in accord with the foregoing. Our decisions are numerous and familiar and this opinion need not be prolonged by a review of them. All the cases in which it was held that the defendant corporation had committed no overt act of insolvency emphasized facts showing that the corpora-

tion was doing business in the ordinary way, with hope of ultimate success though presently embarrassed. In short, that the corporation was a going concern. That was not the case here.

The petitioner further insists that, regardless of insolvency occurring before the death of his testatrix, she was still entitled to preferential payment under section 3899 of the Code. We think this contention cannot be maintained. That section of the Code provides: "The personal representative, upon the death of a stockholder, shall be entitled to receive the full amount paid in by the deceased, and any profits which have been realized."

This provision fixes the right of the representative of a deceased stockholder under the subscription contract of that stockholder with the association. The cases all, however, agree that the insolvency of a building and loan association puts an end to the contract between its members and the association, and it then becomes the duty of the court to distribute the assets of the association, creditors being satisfied, among its members, on equitable principles. *Johnston* v. *Grosvenor, supra,* and authorities therein reviewed. Insolvency having occurred before the death of petitioner's testatrix, at the time of her death she was only entitled to her ratable share of the assets of defendant Association. Her personal representative succeeded to this right and to no greater right.

Counsel for petitioner refer to *Falls* v. *Anglo-Teutonia Building & Loan Association,* 105 Tenn., 18, 58 S. W., 325, as supporting his contention just considered. However it appears from statements contained in counsel's brief that the death of the member there occurred before any overt act of insolvency on the part of the association.

A further contention is made by counsel for petitioner that under chapter 19 of the Acts of 1933 and

*Lunati* v. *Progressive Building & Loan Association*, 167 Tenn., 161, 67 S. W. (2d), 148, the Commissioner of Insurance and Banking has the exclusive right and duty to determine when a building and loan association becomes insolvent. We cannot agree to this argument. Under the statute and the decision, the Commissioner has the exclusive right to institute insolvency proceedings. However, the statutes give him no authority to compel a building and loan association to continue business and no authority to prevent a building and loan association from becoming insolvent or committing an overt act of insolvency.

An exceptionally strong argument has been made in behalf of this petitioner, but we are satisfied that the lower courts properly denied preference to the claim.

### OTHER CLAIMS.

A compromise of the claim of Charles Hudson, Jr., as administrator of the estate of Mrs. John T. Jacocks, has been made with the receiver and approved by the court. This petition is therefore dismissed by agreement.

The disposition of petitions filed in behalf of L. B. Dow, Mary Crenshaw, W. S. Strehl, Estate of Maide Frances Connell, and the petition filed for Eugene B. Badinelli is controlled by what has been hereinbefore said as to other claimants. These claimants are denied preference.

Modified as herein indicated, the decree of the Court of Appeals will be affirmed and the cause remanded to the Chancery Court of Shelby County for further proceedings in accordance with this opinion and the opinion of the Court of Appeals.

DeHaven, J., did not participate in the consideration of this case.